M & R INVESTMENT COMPANY, INC., APPELLANT,
v. RAY GOLDSBERRY, RESPONDENT.

No. 16154

October 22, 1985                         707 P.2d 1143

*Johnson, Pilkington & Reynolds* and *James R. Rosenberger*, Las Vegas, for Appellant.

*Richard S. Segerblom* and *Jimmerson & Combs*, Las Vegas, for Respondent.

# OPINION

*Per Curiam:*

Respondent Ray Goldsberry was hired by appellant M & R Investment Company, owner of the Dunes Hotel and Casino, to work as a dealer at the Dunes in 1978. Goldsberry had worked at other Nevada casinos for sixteen years before joining the Dunes.

In 1981 the Dunes began to make special efforts to attract Asian baccarat[1] players to replace the declining Mexican trade which had been hurt by the devaluation of the peso. Morris Schenker, Chairman of the Board at M & R Investment Company, presided over several meetings with the baccarat dealers and floormen to discuss how the Asian players should be treated. Schenker told the dealers that Asian players would be allowed to eat at the table, bend the cards, and take longer than usual to place their bets, all contrary to normal baccarat rules and procedures. Several dealers, including Goldsberry, testified that they were told to allow Asians to bet after the cards had started coming out of the shoe. Schenker denied that he had ever authorized any late or switch betting after the cards had been dealt from the shoe.

On September 6, 1982 Goldsberry was one of the dealers working the graveyard shift at the baccarat table when a group of Asians came in to play. Between 6:00 a.m. and 7:30 a.m. that morning the Asians won over $200,000 playing baccarat. During the game the Asian players would place bets after the cards had started coming out of the shoe but before any of the cards were seen.

George Joseph, Chief of Surveillance at the Dunes, testified that he studied the video tape of the game later that morning and determined that the Asian players had cheated. Specifically, he

---

[1]Baccarat is a relatively simple game of chance. Two hands of cards are dealt, one for the "Bank" and one for the "Player." Players may bet on either the Bank's hand, the Player's hand, or a tie. The hand which comes closest to nine when the cards are added up (10s and face cards equal zero) wins. For example, if the two cards in the Bank's hand were a 9 and a 6, which adds up to 15, the Bank's hand would be valued at 5; you ignore the first digit in determining the hand's value. The players are allowed to deal the cards from the "shoe" which holds the deck of cards. All bets are normally placed before any cards come out of the shoe even though the cards are face down when dealt.

noted that player number twelve would, by sleight of hand, enable other players to see the cards as they exited the shoe. The players would then switch their bets from bank to player, or vice versa, according to what the cards were.

Goldsberry, four other dealers, two floormen and the baccarat shift boss were fired later that afternoon. Their termination slips stated "failed to protect the game" as the reason for termination. Goldsberry and two other witnesses testified that "failed to protect the game" means that you allowed cheating and that it would be very difficult to get a job with that designation on your record.

Goldsberry testified that he did not attempt to stop the late betting, switching or capping (adding more chips to your bet) because other dealers had been previously reprimanded for attempting to stop late bets and because the floormen told him not to when he asked them if he should. He also testified that the players never changed their bets after the cards were turned over.

Goldsberry looked for work for five months before securing a position as a Blackjack and Roulette dealer at the Nevada Palace at a reduced salary. Goldsberry brought suit against appellant seeking damages for (1) wrongful termination; (2) breach of implied contract of employment; (3) interference with prospective business advantage; and (4) conversion. Goldsberry voluntarily dismissed his conversion claim prior to trial. At the conclusion of Goldsberry's case in chief the district court granted appellant's motion to dismiss the wrongful termination and breach of contract claims pursuant to Nevada Rule of Civil Procedure 41(b). The jury returned a verdict of $78,284.70 for Goldsberry on the intentional interference with prospective business advantage claim.

Appellant contends that the evidence is insufficient to support a finding that appellant intentionally interfered with Goldsberry's prospective contractual relations. We agree and therefore reverse the judgment awarding Goldsberry damages. "This court will not hesitate to disturb a verdict or decision where there is no substantial conflict in the evidence on any material point and the verdict or decision is manifestly contrary to the evidence." Canfield v. Gill, 101 Nev. 170, 171, 697 P.2d 476 (1985).

To establish a prima facie case of intentional interference with prospective contractual relations, a plaintiff must present evidence to show that the interference is intentional. *See* Restatement (Second) of Torts § 766B (1977). *See also* Local Joint Exec. Bd. v. Stern, 98 Nev. 409, 651 P.2d 637 (1982). In Lekich v. International Bus. Mach. Corp., 469 F.Supp. 485 (E.D.Pa. 1979) a federal district court granted the defendant's motion for

summary judgment because of the lack of evidence on the element of intent:

> [T]here can be no doubt that proof of *intentional* interference is a *sine qua non* of the tort. No such proof is possible here, nor is it seriously alleged. We conclude, as a matter of law, that the unchallenged fact that IBM did not release any information about the Lekich matter to any third party, except the dates of employment and title of position released to American Honda . . . precludes a finding of *intentional* interference with prospective contractual relations.

(Emphasis in original.) *Id.* at 489. It is undisputed that appellant never communicated the reason for Goldsberry's termination to his prospective employers. Goldsberry's failure to present any evidence that appellant had somehow communicated the reason for his termination to others precludes a finding that appellant intended to interfere with Goldsberry's prospective contractual relations. Because the jury's verdict is not supported by substantial evidence, we reverse the judgment for Goldsberry. Given our decision on this issue, we need not address appellant's remaining contentions.