**NATIONAL RIGHT TO LIFE POLITICAL ACTION COMMITTEE, Plaintiff,**

v.

**FRIENDS OF BRYAN, Defendant.**

**No. CV–S–88–865–PMP (RJJ).**

United States District Court,
D. Nevada.

May 2, 1990.

Barry Bostrom, James Bopp, Jr., Brames, McCormick, Bopp & Abel, Terre Haute, Ind., Joshua M. Landish, Las Vegas, Nev., for plaintiff.

James J. Jimmerson, Lynn Hansen, Jimmerson & Davis, Las Vegas, Nev., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRO, District Judge.

The 1988 United States Senate race in Nevada between incumbent United States Senator Chic Hecht and Governor Richard Bryan provides the background for the case now before the Court.

As the November 8, 1988, election drew near, various political action committees interceded with political advertisements on various campaign issues which tended to support one candidate over the other. One such political action committee, registered with the Federal Election Commission and based in Washington, D.C., was Plaintiff National Right to Life Political Action Committee. In the late stages of the United States Senate campaign in Nevada, Plaintiff developed a thirty-second radio advertisement and a sixty-second television advertisement which purported to set forth the positions of Senator Hecht and Governor Bryan on the subject of legislation to publicly fund abortion.[1]

---

1. The radio and television advertisements received respectively as Exhibits 3 and 4 at trial are quoted in full as follows:

*Television Script*

This little girl has a friend in the U.S. Senate. Chic Hecht is opposed to abortion on demand, and supports legislation to protect the lives of unborn children. During his career he has voted against abortion and abortion funding 21 times out of 21 votes. Richard Bryan as a legislator voted twice to legalize abortion and now opposes legal protection from abortion for unborn children. The children need a Senator who will work for them. Help the children keep a friend, re-elect Chic Hecht. (Exhibit 3)

Plaintiff used the services of its media buyer, InfoCision Management Corporation of Akron, Ohio, to place the political advertisements with Nevada radio and television stations for broadcast between October 31 and November 7, 1988.

In response, on October 31, 1988, Defendant Friends for Bryan, a political campaign committee registered with the Federal Election Commission and with its primary place of business being in the State of Nevada, sent a letter with enclosures (Defendant's Exhibit Q, attached hereto and hereinafter referred to as "the letter") to every radio station in the State of Nevada which challenged the accuracy of Plaintiff's advertisement and requested that the stations "refuse to run these political advertisements which are inaccurate and distort the candidates' positions." On November 1, 1988, Defendant caused the identical letter to be sent to each television station in the State of Nevada.

On November 3, 1988, Plaintiff commenced this action by filing a complaint alleging that Defendant's letters to Nevada radio and television stations constituted tortious interference with contractual relations and libel against Plaintiff. By its complaint, Plaintiff originally sought compensatory damages and a permanent injunction barring Defendant from further interference with Plaintiff's contracts with television stations regarding Plaintiff's political advertisements.[2]

On December 8, 1989, the Court entered an Order granting Plaintiff's Motion to Dismiss its claim for libel set forth in Count II of the Plaintiff's complaint. On March 19, 1990, trial commenced before the Court sitting without a jury, and concluded on March 22, 1990. Post-trial briefs were filed by the parties on April 2, 1990, and closing arguments were heard on April 4, 1990.

Before resolving whether Plaintiff has proved its claim of intentional interference with contractual relations, the Court must address issues raised by Defendant challenging the jurisdiction of the Court which were not asserted by Defendant by appropriate pretrial motion.

### I.

■ Defendant first argues that under Rule 17(b) of the Federal Rules of Civil Procedure, the corporation National Right to Life Committee, Inc., would have been the proper party to bring this action, and that because Plaintiff National Right to Life Political Action Committee is merely a "separate segregated fund" of the corporation National Right to Life Committee, Inc., Plaintiff does not have the capacity or standing to sue in federal court.

Plaintiff responds that as a separate segregated fund, it is a subsidiary of the corporation National Right to Life Committee, Inc., and enjoys a sufficiently independent legal status to sue as a party in this Court. Alternatively, Plaintiff argues that it may maintain this action under its trade name, National Right to Life Political Action Committee, doing business on behalf of the corporation, National Right to Life Committee, Inc.

The Court finds that given the distinct activities of Plaintiff as the political action committee affiliate of the National Right to Life Committee, Inc., the fact that Plaintiff is registered with the Federal Election Commission as a political action committee

---

*Radio Script*

[Newborn baby's cry] This little girl has a friend in the U.S. Senate. Chic Hecht is opposed to abortion on demand, and supports legislation to protect the lives of unborn children. And, Chic Hecht says "no" to using your tax dollars to pay for abortions. During his Senate career Chic Hecht has voted against abortion and public funding of abortion 100 percent of the time. His opponent, Richard Bryan, opposes legislation to protect the lives of unborn children. One vote does make a difference. On September 30, 1988, the U.S. Senate stopped public funding of abortion in Washington, D.C., by just one vote—Chic Hecht's vote. When you vote—please help the children keep a friend. Re-elect Chic Hecht on November 8, because Chic Hecht does make a difference. Paid for by the National Right to Life Political Action Committee. Not authorized by any candidate. (Exhibit 4)

2. Plaintiff has now abandoned its request for injunctive relief as moot since the election occurred on November 8, 1988, five days after Plaintiff's suit was filed.

with a slate of officers distinguishable from those of the corporation, National Right to Life Committee, Inc., and the fact that Plaintiff maintains separate financial records, Plaintiff is sufficiently distinguishable from the corporation, National Right to Life Committee, Inc., so as to maintain this suit as a party plaintiff.

## II.

■ Defendant next contends that Plaintiff is not the real party in interest because the advertising contracts with Nevada radio and television stations to broadcast Plaintiff's political advertisements were entered by Plaintiff's media buyer, InfoCision. Defendant acknowledges that InfoCision entered the advertising contracts as the agent of, or for the benefit of Plaintiff, but argues that because Plaintiff failed to allege an agency or third-party beneficiary theory of recovery, Plaintiff lacks standing to sue.

The Court must reject Defendant's argument in this regard. As Defendant concedes, the evidence at trial clearly established the existence of an agency relationship between Plaintiff and InfoCision and the advertising contracts entered by InfoCision with members of the media were clearly entered on behalf of and for the benefit of Plaintiff. This is an action in tort, not contract, and it is clear that Defendant's actions were intended to affect Plaintiff, not Plaintiff's media buyer, InfoCision. Therefore, Plaintiff is the real party in interest. *Restatement (Second) of Torts* § 766 comment a (1979). *See also M & R Inv. Co., Inc. v. Goldsberry*, 101 Nev. 620, 623, 707 P.2d 1143, 1144 (1985).

## III.

■ Recognizing that there is diversity of citizenship between the parties, Defendant nonetheless argues the Court lacks subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy does not exceed $10,000.00. Plaintiff responds that the amount in controversy is ordinarily the sum claimed by the Plaintiff in good faith, not the amount a Plaintiff actually recovers.

Over fifty years ago, the United States Supreme Court set forth the standard to be applied in determining the amount in controversy for jurisdictional purposes. In *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), the Court stated:

The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

(Footnotes omitted.)

In *Pachinger v. MGM Grand Hotel–Las Vegas, Inc.*, 802 F.2d 362, 364 (9th Cir. 1986), the Ninth Circuit Court of Appeals cited with approval the following application of the legal certainty test provided in 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3702, at 48–50 (2d ed.1985):

Generally speaking, the legal certainty test makes it very difficult to secure a dismissal of a case on the ground that it does not appear to satisfy the jurisdictional amount requirement. Only three situations clearly meet the legal certainty standard: 1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of law or measure of damages limits the amount of damages recoverable; and 3) when independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction.

Plaintiff argues that it not only alleged damages in excess of $10,000.00 in good faith, but that it has proven damages in the sum of approximately $2,000.00 for lost wages; $12,000.00 for travel expenses incurred by Susan Smith, an employee of National Right to Life Committee, Inc.; $33,500.00 spent on an advertising campaign which failed to reach its target audience because of Defendant's interference; unquantified injury to Plaintiff's reputation among the radio and television stations; the unquantified value of 257,400 lost ad-

vertising impressions; and general damages in an unspecified amount for tortious interference with contractual relations.[3]

The evidence adduced at trial, however, does not support Plaintiff's claim of damages suffered. However, because the issue of Plaintiff's good faith in alleging damages in excess of $10,000.00 is being considered post-trial, it is appropriate to consider the damages proved by Plaintiff in the event liability on the part of Defendant is established.

The record before the Court shows that Plaintiff spent $33,738.00 for the Nevada advertising campaign at issue. Notwithstanding Defendant's letter of October 31, 1988, requesting otherwise, the vast majority of the political advertisements purchased by Plaintiff were broadcast. To the extent they were not, Plaintiff was reimbursed for the cost of the advertisements by the radio and television stations which declined to run them.

Neither can the travel expenses of Susan Smith be attributed to Defendant's actions as the evidence at trial showed Ms. Smith was already committed to be in Nevada on behalf of the National Right To Life Committee, Inc., during the week prior to the election.

Plaintiff failed to establish at trial the extent to which wage loss attributable to the work of employees of the National Right to Life Committee, Inc. on this controversy, can be characterized as wage loss suffered by Plaintiff. The evidence at trial showed that Plaintiff, as a separate segregated fund of the National Right to Life Committee, Inc., was not for the most part responsible for the employee wages paid. Regardless, no reasonable interpretation of the evidence presented at trial would support a finding that the amount of wage loss

suffered by Plaintiff, as the real party in interest, exceeds $2,000.00.

Plaintiff offered no evidence that its reputation among the Nevada radio and television stations involved was injured by virtue of Defendant's actions or for that matter that its reputation was damaged in any respect whatsoever. Indeed, any such claim for damages would seem to have been more properly encompassed by Plaintiff's claim for libel which was dismissed voluntarily by Plaintiff. Neither did Plaintiff offer evidence from which the Court could reasonably determine the damages suffered as a result of lost advertising impressions. In this respect, Plaintiff seems to argue that because an advertising impression may have been lost or may not have reached a particular audience originally targeted by Plaintiff, but instead reached an alternative audience when certain advertisements were delayed or rescheduled, Plaintiff has suffered damage which can be quantified in economic terms. This may be so, but Plaintiff has failed to provide the Court with any factual or legal basis for translating the lost advertising impressions claimed into money damages suffered.

The Court recognizes that a plaintiff who proves a claim of intentional interference with contractual relations is entitled to recover damages for the pecuniary loss of the benefits of the contract; damages for actual harm to reputation, if they are reasonably to be expected to result from the interference; and consequential losses for which the interference is a legal cause. *Restatement (Second) of Torts* § 774A (1979). However, although damages need not be proved to a mathematical certainty, Plaintiff bears the burden of introducing sufficient facts to enable the Court to arrive at an intelligent estimate of damage without speculation or conjecture.

---

**3.** Plaintiff further argues that the Court should consider the fact that Plaintiff's Complaint sought injunctive relief as rendering irrelevant the amount of money damages sought by Plaintiff. The Court rejects this argument. Given the timing of Plaintiff's suit in relation to the election five days later which rendered Plaintiff's request for injunctive relief moot, combined with the fact that Plaintiff took no action to obtain a temporary restraining order or preliminary injunction prior to November 8, 1988, which also happens to be the date on which Defendants were served with the Complaint, the Court finds Plaintiff was not seriously seeking injunctive relief so as to render the amount in controversy irrelevant to a determination of the Court's jurisdiction under 28 U.S.C. § 1332(a).

*Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456–57 (9th Cir.1983); *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir.1982). The Court finds that Plaintiff has failed to reasonably prove damages in excess of $2,000.00.

Nonetheless, given the uncertain nature of damages for possible tortious injury, Plaintiff's ultimate failure of proof with regard to damages does not support a finding that Plaintiff's original allegation of damages was not made "in good faith." *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961).

The Court, therefore, finds that it has subject matter jurisdiction to hear this case under 28 U.S.C. § 1332(a).

### IV.

■ To prove the tort of intentional interference with contractual relations, the Plaintiff must show: (1) a valid and existing contract between Plaintiff, and television and radio stations in Nevada for the airing of the political advertisements in question between October 31 and November 7, 1988; (2) Defendant's knowledge of the contractual relationship; (3) intentional acts by Defendant intended or designed to disrupt the contractual relationship; (4) actual disruption of the contractual relationship; and (5) resulting damage to Plaintiff. *Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev.1989); *Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal.App.3d 1120, 225 Cal.Rptr. 120, 124 (1986). *See generally Restatement (Second) of Torts* § 766 (1979); 2 F. Harper, F. James & O. Gray, *The Law of Torts* §§ 6.5–.12, at 300–55 (2d ed. 1986).

### A.

The testimony of the station managers for Nevada radio stations KOH, KNUU, and KDWN, and television stations KTVN and Prime Cable, as well as the testimony of Steve Pittendrigh, Vice President of In-foCision, establishes the existence of advertising contracts between the stations and InfoCision on behalf of Plaintiff.

■ The fact that, as Defendants argue, the advertising contracts were terminable at will by the radio and television stations does not bar Plaintiff's action for the tort of intentional interference with contractual relations. *Carman v. Heber*, 43 Colo.App. 5, 601 P.2d 646, 648 (1979); *Barlow v. International Harvester Co.*, 95 Idaho 881, 522 P.2d 1102, 1114–15 (1974).[4]

### B.

■ The extent to which Defendant can be found to have knowledge of the contractual relationship between Plaintiff and the foregoing radio and television stations is more problematical.

Interference with contractual relations is an intentional tort which requires that the Defendant know of the existence of the contract with which it interferes or, at least, of facts from which the existence of the contract can reasonably be inferred. *Restatement (Second) of Torts* § 766 comment i (1979); *Allstate Beer, Inc. v. Julius Wile Sons & Co.*, 479 F.Supp. 605, 612 (N.D.Ga.1979).

The evidence adduced at trial does not show that Defendant had actual knowledge of the specific contracts between Plaintiff and the pertinent radio and television stations. However, Bill Bible, manager of the Bryan campaign, testified that Defendant purchased political advertisements on every radio and television station in Nevada through its media buyer, and that he was generally aware that the purchase of such advertisements involved oral or written contracts. Similarly, Defendant's general counsel, Jeffrey Eskin, testified that as a lawyer he assumed that agreements to purchase radio and television advertisement time would be based on a contract. Under the circumstances, Defendant must be deemed to have possessed facts which

---

**4.** *See also Restatement (Second) of Torts* § 766 comment g (1979) which provides that a defendant may not interfere with a valid contract even if it is terminable at will, but also recognizes that the fact that the contract is terminable at will is a factor to be taken into account in determining the damages that a plaintiff has suffered.

would reasonably lead Defendant to believe that Plaintiff's political advertisements were being run by radio and television stations pursuant to a contract.

## C.

■ At the heart of this action is whether Plaintiff has proved intentional acts by Defendant intended or designed to disrupt Plaintiff's contractual relations with the radio and television stations to broadcast Plaintiff's political advertisements during the final week of the Senate campaign. It is at this point that Plaintiff's action fails as it is here that Defendant's motive for sending the letter to Nevada radio and television stations becomes relevant. *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1347–51 (9th Cir. 1980); *Locricchio v. Legal Servs. Corp.*, 833 F.2d 1352, 1358 (9th Cir.1987); *Ramona Manor Convalescent Hosp.*, 177 Cal. App.3d 1120, 225 Cal.Rptr. 120; *Top Servs. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365 (1978).

> The fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability. *Inquiry into the motive or purpose of the actor is necessary.* The inducement of a breach, therefore, does not always vest third or incidental persons with a tort action against the one who interfered. Where the actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstances, it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly. The extent of liability, for this tort, is fixed in part by the motive or purpose of the actor. *See Restatement (Second) of Torts* § 766 Comment j and § 767 Comment d (1979).

*DeVoto*, 618 F.2d at 1347 (emphasis added).[5]

As the Ninth Circuit Court of Appeals succinctly stated in *DeVoto*, 618 F.2d at 1348, "It is the intentional attainment of an unjust advantage which underlies the requirement that the interference be improper, *Restatement (Second) of Torts* § 767 (1979), and motive or purpose is usually an accurate measure of the advantage the actor sought and of its just or unjust character."[6]

**5.** 2 F. Harper, F. James & O. Gray, *The Law of Torts* § 6.8, at 318–20 (2d ed. 1986), in pertinent part offers the following discussion of the tortious intention required to sustain a finding of liability:

> But often, the actor will act with knowledge that his conduct will cause a breach of a contract between the plaintiff and a third person although he is not acting primarily to bring about that result or to obtain for himself the benefit of that contract. The actor seeks to gain some other objective of his own, the breach of the contract being a certain but incidental result of his action.... Such mixed motives often present difficult policy decisions. They can be handled under the issue of privilege where, along with other factors, they are pertinent to the question whether the actor is justified in conduct that he knows will necessarily or probably result in the loss of contractual advantages to an innocent third person. Or they can be approached under the second Restatements concept that the actor, to be subject to liability, must interfere not only 'intentionally' but also 'improperly.' Knowledge that an act directed at one person is also 'substantially certain' to lead to interference with a contract between that person and another makes that consequence 'intended' in Restatement nomen-

clature, but more in the way of culpable motive is required to constitute the tort as it is therein described.

(Citing *DeVoto*, 618 F.2d at 1347–49) (Footnotes omitted).

**6.** In *Sutherland*, 772 P.2d at 1290, the Nevada Supreme Court made its most recent pronouncement of the elements necessary to establish the tort of intentional interference with contractual relations. There the Court did not discuss in detail the quality of intent required to sustain liability. However, in setting forth the elements of the tort, the Nevada Supreme Court relied on the opinion of the California Court of Appeals in *Ramona Manor Convalescent Hospital*, 177 Cal.App.3d 1120, 225 Cal.Rptr. 120, wherein the California Court reiterated the requirement of "culpable intent" and noted that given the intention to interfere with a contract, liability usually will turn upon the ultimate purpose or object which a defendant is seeking to advance. *See also Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 686 P.2d 1158, 206 Cal.Rptr. 354 (1984).

A useful characterization of the degree of intent required to sustain liability for intentional interference with contractual relations was provided by the Oregon Supreme Court in *Top*

The Court must, therefore, consider Defendant's motive in sending the letter to Nevada radio and television stations in response to Plaintiff's political advertisements. Did Defendant pursue an improper objective of harming Plaintiff or use wrongful means that in fact caused injury to Plaintiff's contractual relationship with the broadcasters? The Court finds it did not.

Defendant's letter of October 31, 1988, was not sent only to those radio and television stations with which Plaintiff had a contract for broadcast of the political advertisements in question. Defendant did not know the stations with which Plaintiff had contracted. Instead, Defendant's letter was sent to all Nevada radio and television stations on November 1, 1988, as a prophylactic measure to ensure that any Nevada broadcaster which had a contract with Plaintiff would be made aware of what Defendant claimed to be inaccuracies in Plaintiff's advertisements.

Jeffrey Eskin, Defendant's general counsel, signed the letter and testified that he adapted it from a generic letter prepared by Robert F. Bauer, Counsel to the Democratic Senatorial Campaign Committee.[7]

Robert Bauer testified that the generic letter (Exhibit 33) was designed to deal with eleventh hour "attack advertising" by a political action committee when a political candidate has very limited recourse to respond. Bauer further testified that the purpose of the letter is to open a "proper legal dialogue" with broadcasters and to draw their attention to inaccuracies in political advertisements offered by political action committees.

Bill Bible and Jeffrey Eskin testified that Defendant's intent in sending the letter was to inform Nevada radio and television stations of purported inaccuracies in Plaintiff's political advertisements, and to request them not to broadcast "political advertisements which are inaccurate and distort the candidates positions." Eskin testified the letter was not intended to threaten or intimidate the broadcasters, but to provide information which would enable the radio and television stations to make their own decisions whether to broadcast Plaintiff's political advertisements.

The radio and television station representatives called to testify, as well as Steve Pittendrigh of InfoCision, stated that they fully understood broadcasters were entitled to decline political advertisements from political action committees which the broadcasters considered to be inaccurate. *Columbia Broadcasting, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).

The radio and television station representatives further testified that they were not threatened or intimidated by Defendant's letter, but that the letter caused each of them, in varying degrees, to attempt to verify the accuracy of Plaintiff's advertisements. The broadcasters testified that their decisions to continue or to decline Plaintiff's political advertisements were based upon their independent judgments as to the accuracy of the advertisements and what they viewed as their public responsibility to broadcast accurate information.

The situation faced by the broadcasters upon receipt of Defendant's letter is well illustrated by the testimony of Doug Trenner, owner of KNEWs radio. Trenner testified that upon receiving Defendant's letter and a telephone call from Jeffrey Eskin regarding inaccuracies in Plaintiff's political advertisements, he really did not think so much about the legal position of his

---

*Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978), wherein Justice Linde wrote:

In summary, such a claim is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means.

7. The generic letter prepared by Robert Bauer was received as Exhibit 33, and other versions of the letter which were utilized in the 1988 North Dakota Burdick for Senate Campaign (Exhibit 6) and 1988 Nebraska Kerry for Senate Campaign (Exhibit #7) were also received. Bauer testified that he originally developed the generic letter in 1980, and that he had refined it to meet the needs of various campaigns in recent years.

radio station as he did about fairness. Trenner testified that he consulted with his news department regarding the voting records of Hecht and Bryan and satisfied himself that Plaintiff's political advertisement was not entirely accurate. Trenner further testified that in his view, he had not only a right but a genuine public responsibility to cancel advertisements which he understood to be inaccurate.

Dennis Siewart, General Manager of KTVN television in Reno, testified that he engaged in a similar evaluation upon receipt of Defendant's letter. Siewart testified that as a holder of an FCC license, he felt it his obligation to verify that Plaintiff's advertisements were accurate. Siewart further testified that after obtaining documentation from Plaintiff which supported the accuracy of Plaintiff's advertisement, he decided to continue to broadcast it. Siewart further testified that he did not view Defendant's letter as containing a threat of a lawsuit against KTVN and that in his opinion it was appropriate for a group such as Defendant to bring areas of inaccuracy to the attention of broadcasters.[8]

Ken Mendenhall, General Manager of KOH Radio testified that after receiving Defendant's letter, he decided not to continue broadcasting Plaintiff's advertisement because of the possibility that it contained inaccurate or misleading information. Mendenhall also testified that he receives letters similar to that sent by Defendant during every election. Mark Steiner, Account Executive with Prime Cable Television testified that after receiving Defendant's letter, he consulted with his sales manager and after contacting InfoCision to obtain backup information in support of Plaintiff's advertisement, decided to continue broadcasting it. Steiner further testified that he did not feel Defendant's letter was unreasonable or improper, and that in fact he made no judgment about the letter at all.

The fact that Plaintiff and Defendant disagree as to the accuracy of Plaintiff's political advertisements is not surprising. Neither is it controlling. Whether Plaintiff's advertisements were entirely accurate is open to legitimate question. The evidence at trial shows Defendant had a reasonable basis for believing they were not. Under the circumstances, and particularly given the lack of reasonable alternatives given the proximity of the election, Defendant was justified in bringing the issue of the accuracy of Plaintiff's advertisements to the attention of the radio and television stations which were being asked to broadcast them. The decision whether to broadcast Plaintiff's advertisements was thereafter left where it properly should be, with the radio and television broadcasters involved. Each broadcaster made an independent decision whether to continue with Plaintiff's advertisements. Most did, but the fact that some decided not to based upon their determination that the accuracy of the advertisements was open to legitimate debate, does not render Defendant's actions improper.

In *Columbia Broadcasting, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 the Supreme Court held there is no private right of access to broadcast stations. As the Supreme Court noted, in enacting certain provisions of the Communications Act of 1934, "Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." 412 U.S. at 110, 93 S.Ct. at 2090.

Broadcasters are not insulated from external information when making their editorial decision as to what political advertisements to accept for broadcast, nor should they be.

This would remove reason from discretion and create choice in a vacuum. The result would deny broadcasters their

---

**8.** Siewart also testified that prior to continuing to broadcast Plaintiff's political advertisements, upon advice of counsel, he secured an indemnity agreement (Exhibit #26) to protect KTVN against any libel suits which might be filed in

response to Plaintiff's advertisements. Siewart could not say, however, whether he would have continued to broadcast Plaintiff's advertisements without the indemnification agreement.

journalistic and intellectual freedom by censoring and/or constricting the information they may receive and rely upon in choosing what they will publish over the airwaves. *National Conservative Political Action Comm. v. Kennedy*, 563 F.Supp. 622, 625 (D.D.C.1983), *aff'd*, 729 F.2d 863 (D.C.Cir. 1984).

Plaintiff correctly argues that it was exercising its constitutionally protected right to participate in the political process and its right to free speech when it sought to broadcast the political advertisements in question. However, nothing that occurred here inhibited Plaintiff's right to do so. Indeed, to hold Defendant's action in this case to be an unjustified interference with Plaintiff's First Amendment rights would infringe upon the First Amendment rights of Defendant and others to communicate their views to broadcasters and would likewise stifle the concomitant right of broadcasters to listen to that speech. *Id.* at 626.

Defendant's actions did not deprive Plaintiff of their right to convey to broadcasters the reasons why Plaintiff's advertisement should be broadcast. Indeed there is ample evidence that Plaintiff did so and that for the most part Plaintiff was successful in securing the continued broadcasting of its advertisements.

This is not to say Defendant's letter of October 31, 1988, should be considered as a paradigm for the preferred response to instances wherein questions regarding the accuracy of political action committee advertisements arise. Indeed, Defendant's letter can properly be characterized as an unartful "scissors and paste" effort to adapt Robert Bauer's generic letter to fit the particular circumstances of Plaintiff's political advertisements as they related to the United States Senate Campaign in Nevada. As such, Defendant's letter carried material regarding a broadcasters liability for libel and FCC regulations which was not necessary to enable Defendant to communicate its concerns to the radio and television stations regarding the accuracy of Plaintiff's advertisements. However, the evidence presented at trial does not support a finding that the additional material was included to threaten or intimidate the broadcasters, and it is clear that the broadcasters were not in fact coerced or intimidated by Defendant's letter.

Considering Defendant's letter and attachments in its entirety, together with the other evidence adduced at trial, the Court finds the record does not support a finding that Defendant's actions were the product of an improper or unjustified motive. *De-Voto*, 618 F.2d at 1347–48; *Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671, 676–79 (2d Cir.1983). Therefore, Defendant cannot be held liable for intentionally interfering with Plaintiff's contractual relations. Accordingly, Defendant is entitled to judgment.

IT IS SO ORDERED.

### APPENDIX

#### Defendant's Exhibit Q

October 31, 1988

Dear Station Manager:

A disturbing trend has emerged in the last few weeks of this year's campaign for the United States Senate in Nevada.

At least three so-called "independent" organizations have announced that they intend to run negative commercials against Governor Richard Bryan on radio and television.

Your station is not obliged to accept these "independent" committee advertisements for broadcast, nor is it required to account in any way for its decision to reject them. *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94 (1973): *You Can't Afford Dodd Committee*, 81 F.C.C.2d 579 (1980). The repeated efforts of these kind of organizations to obtain just such a private right to access have been consistently rejected by the Federal Communications Commissions ("F.C.C."), *National Conservative Political Action Committee*, 89 F.C.C.2d 626 (1982). There are numerous valid reasons for refusing to broadcast the ads.

## Background: Questionable Activities

The campaigns of organizations such as the above are marked by highly derogatory attacks on the candidates they seek to defeat. Even more frequently, the advertisements distort and misrepresent the candidate's position on the issues addressed.

## Liability for Libelous Broadcasts by Independent Committees

Under Section 315(a) of the Federal Communications Act, broadcast stations are expressly prohibited from censoring in any way material submitted by a candidate for broadcast. Since the stations may not censor or otherwise exercise editorial control over such materials, they are not legally liable in any libel actions arising out of representation made by a candidate in their broadcasts. *Farmers Educational and Cooperative Union v. DAY, Inc.*, 360 U.S. 525 (1959).

This immunity does not, however, apply to representation made in political broadcasts by non-candidates, such as "independent" committees like those mentioned above. Broadcast stations are fully liable for libelous attacks made by such committees upon U.S. Senate candidates in their political broadcasts. *In Re Complaint of Senator Thomas F. Eagleton*, 81 F.C.C.2d 423 (1980); *Felix v. Westinghouse Radio Stations*, 186 U.S. 909 (1951).

The F.C.C.'s Broadcast Bureau has stated the fundamental principle of law as follows:

> With the exception of statements made during "uses" by legally qualified candidates for public office, which cannot be censored, a broadcaster may be subject to defamation proceedings under the jurisdiction of the appropriate local courts. Therefore, it is left to each station or network to make its own determinations of whether material contemplated for broadcast may contain statements which may subject it to potential liability.

*Letter to J. Curtis Herge*, attorney for NCPAC, from Broadcast Bureau Staff, dated November 20, 1981, p. 4.

## Personal Attack

Stations must also afford a free opportunity to respond to candidates who are victims of a "personal attack" by persons other than legally qualified candidates, their authorized spokesmen, or those associated with their campaign. 47 C.F.R. Sec. 72.1920(a), (b)(3), provided that the personal attack does not occur during bona fide news events. 47 C.F.R. Sec. 73.1920(b)(4). In order for the personal attack rule to come into play, the attack must occur during "the presentation of views on a controversial issue of public importance." 47 C.F.R. Sec. 73.1920(a).

A "personal attack" is an attack made upon the "honesty, character, integrity or like personal qualities of" the candidate. 47 C.F.R. Sec. 73.1920(a).

Under the F.C.C. regulations, a station has an affirmative obligation in the event of a "personal attack": Within one week it must notify the person or group attacked of the date and time and identification of the broadcast, send a script or tape of the attack (or if a script or tape is not available, as accurate a summary as possible) to the victim of the attack, and afford the victim a reasonable opportunity to reply on the station's facility, *without charge*, 47 C.F.R. Sec. 73.1920(a)(1)–(3).

In the event that the station does not comply with this affirmative duty to notify a candidate of an attack, and to afford that candidate a reasonable opportunity to respond without charge, the target of the attack is entitled to bring a complaint before the F.C.C. and to seek remedial administrative action by the agency.

Finally, we have enclosed for your review an example of the National Right To Life's abortion radio ad which misrepresents Senator Hecht's voting record on abortion. Documents indicating the Senator's votes to federally fund abortions are provided herein. Governor Bryan's abortion position is also included for your consideration.[*] We respectfully request that you refuse to run these political advertisements which are inaccurate and distort the candidates' positions.

* [Editor's Note: Enclosures omitted by the court.]

If you have any questions, please call 731–1988 or 732–3144.

Sincerely,

/s/ Jeffrey L. Eskin

Jeffrey L. Eskin, Esq.