J.J. INDUSTRIES, LLC, APPELLANT/CROSS-RESPONDENT, *v.* HALE B. BENNETT, RESPONDENT/CROSS-APPELLANT, AND NORMAN KAYE AND KAY BENNETT, RESPONDENTS.

No. 35873

July 8, 2003      71 P.3d 1264

[Rehearing denied August 22, 2003]

[En banc reconsideration denied October 23, 2003]

*Sherry B. Bowers* and *Glade L. Hall,* Reno, for Appellant/ Cross-Respondent.

*Schwartzer & McPherson Law Firm* and *Lenard E. Schwartzer,* Las Vegas, for Richard A. Davis, Trustee in the bankruptcy case of Respondent Norman Kaye.

*Lemons Grundy & Eisenberg* and *Robert L. Eisenberg,* Reno, for Respondent/Cross-Appellant Hale Bennett and Respondent Kay Bennett.

Before AGOSTI, C. J., ROSE and MAUPIN, JJ.

## OPINION

*Per Curiam:*

In this appeal, we define the elements for an intentional interference with contractual relations claim, specifically the elements of knowledge and intentional acts.

### FACTS

In 1951, Norman Kaye acquired 152 acres of undeveloped land (the property) in Silver Springs, Nevada. The property is adjacent to the Silver Springs Airport, which respondents Hale and Kay Bennett principally own through Silver Springs Airport, LLC (Silver Springs).[1]

In June 1979, Jerome Cardin loaned Kaye $75,000, and in consideration for the loan, Kaye placed Cardin's name on the title of the property as a joint tenant, listing Cardin as a single man even though he was married. In 1997, Kaye filed Cardin's death certificate, and consequently, Kaye owned the entire property. Regarding the loan, Kaye testified that in 1985, when the note was due, he paid Cardin $35,500, half of the note.

In December 1997, Kaye signed an agreement authorizing Gloria Crockett, a real estate agent, to sell the property. Shortly thereafter, Crockett found a potential buyer, J.J. Industries, LLC, which was represented by John Hui. Crockett then contacted Hale Bennett, first informing him that she had a potential buyer and next asking him if he had any information about Lyon

---

[1] The Bennetts own 80 percent of Silver Springs, while their children own 20 percent.

County or the FAA, but Hale Bennett insisted that he had no information.

On January 20, 1998, Kaye and Hui entered into a land purchase agreement for $152,000. Kaye and Hui opened escrow with United Title in Reno, but escrow was eventually transferred to the company's office in Las Vegas. Thereafter, Kaye and Hui agreed to transfer escrow from United Title in Las Vegas to American Title in Yerington. After escrow was transferred, American Title conducted a title search, discovering a deed of trust on the property, dated 1979, which secured the Cardin note. Donna Glock, title officer with American Title, attempted to clear the Cardin cloud, but she discovered that Kaye was directly negotiating with the Cardin heirs to clear the title. Nevertheless, on February 27, 1998, American Title generated a notice of default, which the Cardins signed, and which was filed on March 18. Kaye discovered the notice of default on March 26, 1998.

Pursuant to the land purchase agreement, escrow was to close on or before January 31, 1998. But escrow did not close by January 31, 1998, and Kaye sent a fax to Crockett complaining that escrow had not closed. Escrow was then extended to March 30, 1998. In April 1998, American Title sent Kaye the escrow instructions, but Kaye refused to sign them.

Shortly thereafter, Kaye contacted Hale Bennett, asking him if he was interested in buying the property. Hale Bennett inquired about the status of the existing sale, and Kaye responded that it had been terminated, fallen out of escrow. Kaye and Hale Bennett reached an agreement for a purchase price of $250,000. Hale Bennett claimed that he negotiated the purchase of the property on behalf of Silver Springs. Although the Bennetts signed the purchase agreement and this agreement failed to mention Silver Springs as the purchaser, the document was later corrected to indicate that Silver Springs was the owner of the property.

On May 1, 1998, Hui, on behalf of J.J. Industries, filed and recorded a memorandum with the Lyon County Recorder, providing notice that J.J. Industries and Kaye entered into an agreement to purchase the property. The memorandum described the property and provided the assessor parcel number. During his title search of the property, Hale Bennett found Hui's memorandum, but according to Hale Bennett, the memorandum described a different piece of property. Although the memorandum contained the assessor parcel number, Hale Bennett did not have the number with him to compare. Based upon his assumption, Hale Bennett ignored the memorandum, as he believed it was not germane to the property.

Hale Bennett attempted to open escrow at Stewart Title in Carson City, but Stewart Title refused because of the clouds on the title. Escrow was eventually closed through Kaye and the Bennetts' attorneys.

On October 5, 1998, J.J. Industries filed a complaint against Norman Kaye and his wife, Cheryle, alleging breach of contract, and against the Bennetts, alleging interference with contractual relations. J.J. Industries also brought a claim for specific performance, but it was dismissed because J.J. Industries failed to name Silver Springs in the complaint. Before trial, Cheryle Kaye was dismissed because she executed a quitclaim deed on June 12, 1979, thereby disclaiming any interest in the property. In addition, the district court dismissed Kay Bennett during trial because J.J. Industries failed to produce any evidence that she interfered with the contract.

At trial, Hale Bennett denied that he interfered with any contract that J.J. Industries had with Kaye, explaining that although he knew there was an agreement between Kaye and J.J.Industries, Kaye represented to him that the contract was terminated. Kaye contested the existence of any contract with J.J. Industries, explaining that he did not feel bound by the contract as of February 17, 1998. Hui, on the other hand, testified that he never agreed to terminate the contract between Kaye and J.J. Industries, explaining that he sent various letters inquiring whether Kaye was going to sign the escrow instructions. He also testified that he would have expected to make five million dollars on the property after he developed an outlet mall and an industrial park on the property.

The jury entered a general verdict, finding in favor of J.J. Industries on both causes of action. The jury assessed damages of $598,000 against Kaye, and $336,000 against Hale Bennett.

J.J. Industries appeals, challenging the dismissal of Kay Bennett and the dismissal of its specific performance claim. Hale Bennett cross-appeals, arguing that there was insufficient evidence of intentional interference with the contract and that the damage award was excessive as a matter of law; Kaye also argues that the damage award was excessive.

## DISCUSSION

On cross-appeal, Hale contends that there was insufficient evidence that he intentionally interfered with the contract between J.J. Industries and Kaye. When the sufficiency of evidence is challenged on appeal, this court determines whether, after viewing all inferences in favor of the prevailing party, substantial evidence supports the jury's verdict.[2] In doing so, this court is not at liberty to weigh conflicting evidence.[3]

---

[2]*Taylor v. Thunder,* 116 Nev. 968, 974, 13 P.3d 43, 46 (2000).
[3]*Id.*

In an action for intentional interference with contractual relations, a plaintiff must establish:

(1) a valid and existing contract;
(2) the defendant's knowledge of the contract;
(3) intentional acts intended or designed to disrupt the contractual relationship;
(4) actual disruption of the contract; and
(5) resulting damage.[4]

Although we have set forth the elements for an intentional interference with contractual relations claim, we have yet to define the elements, in particular, the elements of knowledge and intentional acts. We now take the opportunity to do so.

Hale Bennett first contends that, at the time he entered into the purchase agreement with Kaye, he did not have actual knowledge of the contract between J.J. Industries and Kaye because Kaye unequivocally told him that the contract had been canceled. *Restatement (Second) of Torts* § 766 cmt. i (1979) provides that "the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract." Because interference with contractual relations is an intentional tort, the plaintiff must demonstrate that the defendant knew of the existing contract, or at the very least, establish "facts from which the existence of the contract can reasonably be inferred."[5]

Here, Hale Bennett knew that Kaye had a contract with J.J. Industries because he specifically asked Kaye about the status of the contract when Kaye offered him the property. Although Kaye informed Hale Bennett that the contract had been terminated, Hale Bennett discovered Hui's memorandum, which was dated a month after he had been negotiating with Kaye to purchase the property. Even though Hale Bennett testified that he did not believe that Hui's memorandum was germane to the property because he believed that the legal description was incorrect, we conclude that it was reasonable for the jury to infer that he was aware of the contract between J.J. Industries and Kaye.

Next, Hale Bennett argues that there was insufficient evidence that he intended or designed to disrupt the contractual relationship

---

[4]*Sutherland v. Gross,* 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989) (placed in list format).

[5]*Nat. Right to Life P. A. Com. v. Friends of Bryan,* 741 F. Supp. 807, 813 (D. Nev. 1990); *see also Sebastian Intern., Inc. v. Russolillo,* 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001).

between J.J. Industries and Kaye. J.J. Industries contends that Hale Bennett's knowledge of the contract between it and Kaye was sufficient to establish this element. We disagree.

" ' 'At the heart of [an intentional interference] action is whether Plaintiff has proved *intentional acts by Defendant* intended or designed to disrupt Plaintiff's contractual relations. . . .' ' "[6] Contrary to J.J. Industries' argument, one does not commit the necessary intentional act—inducement to commit breach of contract—merely by entering into an agreement with knowledge that the other party cannot perform because there is an existing contract between the other party and a third person.[7] Indeed, the United States District Court of Nevada, interpreting Nevada law, explained that the plaintiff must establish that the defendant had a motive to induce breach of the contract with the third party:

> "The fact of a general intent to interfere, under a definition that includes imputed knowledge of consequences, does not alone suffice to impose liability. *Inquiry into the motive or purpose of the actor is necessary.* The inducement of a breach, therefore, does not always vest third or incidental persons with a tort action against the one who interfered. Where the actor's conduct is not criminal or fraudulent, and absent some other aggravating circumstances, it is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly."[8]

As previously noted, in *Sutherland* we provided the necessary elements to establish the tort of intentional interference with contractual relations. In doing so, we relied on *Ramona Manor Convalescent Hospital v. Care Enterprises.*[9] In that case, the California Court of Appeal explained that the plaintiff must prove that the defendant intended to induce the other person to breach its contract with the plaintiff.[10] The court noted that because the action involves an intentional tort, the inquiry usually concerns the defendant's ultimate purpose or the objective that he or she is seek-

---

[6]*Las Vegas Investors v. Pacific Malibu Dev. Corp.,* 867 F. Supp. 920, 925 (D. Nev. 1994) (alteration and emphasis in original) (quoting *Nat. Right to Life P. A. Com.,* 741 F. Supp at 814).

[7]*See Restatement (Second) of Torts* § 766 cmt. n (1979).

[8]*Nat. Right to Life P. A. Com.,* 741 F. Supp. at 814 (emphasis in original) (quoting *DeVoto v. Pacific Fid. Life Ins. Co.,* 618 F.2d 1340, 1347 (9th Cir. 1980)).

[9]225 Cal. Rptr. 120, 124 (Ct. App. 1986).

[10]*Id.* at 124.

ing to advance.[11] Thus, mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff. Accordingly, the plaintiff must inquire into the defendant's motive.

Applying these principles to the present case, we conclude that there is insufficient evidence to support the conclusion that Hale Bennett committed intentional acts designed to disrupt the contract between J.J. Industries and Kaye. Hale Bennett testified that Kaye called him, asking him if he was interested in buying the property. During their conversation, Hale Bennett inquired about the status of the existing sale, and Kaye responded that it had been terminated. Kaye's response indicated that Kaye no longer felt bound by the contract; indeed, Kaye testified that as of February 17, 1998, he did not feel bound by the contract with J.J. Industries. Although Hale Bennett paid approximately $100,000 more for the property, there was no evidence adduced at trial that Hale Bennett knew J.J. Industries' purchase price. Thus, there was no evidence that Hale Bennett induced Kaye to breach the contract. Consequently, Hale Bennett cannot be held liable for intentionally interfering with J.J. Industries' contractual relations.

Because we conclude that J.J. Industries' claim against Hale Bennett fails, we need not address Hale Bennett's argument that the damage award against him was excessive as a matter of law. However, Kaye likewise argues that the breach of contract damage award—$598,000—against him was excessive as a matter of law. We have stated that the measure of damages in an action for breach of contract to sell real estate is "the difference between the contract price and the market value of the land on the date of the breach."[12] Notably, the district court instructed the jury on the proper measure of damages for breach of contract. However, the only evidence presented at trial relating to the value of the property at the time of the breach was Hale Bennett's testimony that he purchased the property for $250,000. Thus, we conclude that the jury's contract damage award of $598,000 was based on speculation.[13] Therefore, we conclude that the damage award against Kaye should be reduced to $98,000—the difference between the contract price be-

---

[11]*Id.* at 125.

[12]*Harris v. Shell Dev. Corp.*, 95 Nev. 348, 352, 594 P.2d 731, 734 (1979).

[13]*See Gramanz v. T-Shirts and Souvenirs, Inc.*, 111 Nev. 478, 485, 894 P.2d 342, 347 (1995) (noting that a verdict may not be based on speculation).

tween J.J. Industries and Kaye ($152,000) and Hale Bennett's purchase price ($250,000).[14]

Finally, we conclude that J.J. Industries' contentions on appeal lack merit.

## CONCLUSION

Because there was insufficient evidence that Hale Bennett intentionally interfered with the contract between J.J. Industries and Kaye, we reverse that portion of the judgment against Hale Bennett. Regarding Kaye, we reverse that portion of the judgment awarding breach of contract damages and remand the case to the district court with instructions to reduce the damage award against Kaye to $98,000. We affirm the district court's judgment in all other respects.

---

[14]Hale Bennett and Kaye argue that any punitive damage award was erroneous. However, there was no award for punitive damages, and thus, we decline to address this argument.