133 Nev., Advance Opinion 68

# IN THE SUPREME COURT OF THE STATE OF NEVADA

|  |  |
|---|---|
| FORD MOTOR COMPANY,<br>Appellant,<br>vs.<br>TERESA GARCIA TREJO, AS THE<br>SUCCESSOR-IN-INTEREST AND<br>SURVIVING SPOUSE OF RAFAEL<br>TREJO, DECEASED,<br>Respondent. | No. 67843<br><br>**FILED**<br>SEP 27 2017<br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY<br>CHIEF DEPUTY CLERK |

Appeal from a final judgment on a jury verdict in a strict liability design defect action and post-judgment order denying a motion for judgment as a matter of law or a new trial and awarding costs. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

Snell & Wilmer, L.L.P., and Jay J. Schuttert, Vaughn A. Crawford, and Morgan T. Petrelli, Las Vegas; Horvitz & Levy, LLP, and Emily V. Cuatto and Lisa Perrochet, Encino, California; Thompson Coe Cousins & Irons, L.L.P., and Michael W. Eady, Austin, Texas,
for Appellant.

David N. Frederick, Las Vegas; Naylor & Braster and A. William Maupin, John M. Naylor, and Jennifer L. Braster, Las Vegas; Nettles Law Firm and Brian D. Nettles and William R. Killip, Jr., Henderson; Garcia Ochoa Mask and Ricardo A. Garcia and Jody R. Mask, McAllen, Texas; Lawrence Law Firm and Larry Wayne Lawrence, Austin, Texas,
for Respondent.

Bailey Kennedy and Dennis L. Kennedy and Sarah E. Harmon, Las Vegas; Shook Hardy & Bacon, L.L.P., and Victor E. Schwartz, Washington, D.C., for Amici Curiae National Association of Manufacturers and the Alliance of Automobile Manufacturers.

Matthew L. Sharp, Ltd., and Matthew L. Sharp, Reno; Eglet & Prince and Robert T. Eglet and Erica D. Entsminger, Las Vegas, for Amicus Curiae Nevada Justice Association.

---

BEFORE THE COURT EN BANC.[1]

*OPINION*

By the Court, STIGLICH, J.:

In Nevada, claims of design defect are historically governed by the consumer-expectation test. Under this test, a product is defectively designed if it "fail[s] to perform in the manner reasonably to be expected in light of its nature and intended function and [is] more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 413, 470 P.2d 135, 138 (1970).

In this case, the court is asked to consider adopting the risk-utility analysis for determining whether a defendant is liable for a design defect under a strict product liability theory, as set forth in the Restatement (Third) of Torts: Products Liability (Third Restatement). Risk-utility analysis differs from the consumer-expectation test in that it analyzes the reasonableness of a manufacturer's actions, rather than the product itself, in determining whether a product is unreasonably

---

[1]The Honorable Ron Parraguirre, Justice, voluntarily recused himself from participation in the decision of this matter.

dangerous. The risk-utility test also requires plaintiffs to present affirmative proof of a reasonable alternative design.

As discussed below, the risk-utility analysis represents a substantial departure from the underlying tenets of our strict products liability jurisprudence, which does not rest on traditional concepts of fault. Further, this court strongly disagrees with the notion that a plaintiff in a strict product liability design defect action must present proof of an alternative design. Such a requirement unfairly raises a plaintiff's burden of proof, and in some cases, poses an insurmountable barrier to bringing a claim. Therefore, this court declines to adopt the risk-utility test for strict product liability design defect claims. Claims of design defect grounded on strict product liability in Nevada will continue to be governed by the consumer-expectation test.

## BACKGROUND

*The Ford Excursion*

In 1999, appellant Ford Motor Company introduced the Ford Excursion, the largest and heaviest SUV ever produced and sold in North America. Ford based its design of the Excursion on Ford's line of Super Duty pickup trucks, such as the F250, F350, and F450.

At trial, Ford conceded that it did not perform any physical roof-crush tests on the Excursion. In 2002, Ford ran computer-simulated testing on the Excursion, using modeling that had been developed during the development of the Super Duty pickup trucks. Ford's internal guidelines required that a vehicle weighing less than 8,500 pounds have a roof strength-to-weight ratio of 1.725 pounds. The strength-to-weight ratio of the Excursion was only 1.25. If the windows were not available to act as added support (e.g., if the windows broke), the strength-to-weight ratio dropped to 0.79.

 

Though the Excursion's actual weight was 7,730 pounds, its gross vehicle weight rating was 8,600 pounds. Ford did not have internal guidelines for strength-to-weight ratios for vehicles weighing over 8,500 pounds. Therefore, Ford did not issue any recalls on the Excursion, or otherwise advise dealerships or the public that early versions of the Excursion did not meet Ford's internal guidelines for roof strength.

*The Trejos' accident*

On December 16, 2009, respondent Teresa Trejo, a resident of Las Vegas, was driving a 2000 Ford Excursion, with a trailer attached, through New Mexico. Her husband Rafael Trejo was seated in the passenger seat. While driving on the highway, Trejo attempted to change lanes to make room for merging traffic. The trailer attached to the Excursion started to fishtail. Trejo swerved, and though the Excursion slowed, it began to roll, somewhere between 1.5 and 2.5 times.

After the rollover sequence, the Excursion came to rest upside down. Trejo managed to remove her seatbelt and exit the Excursion through the driver's side window. She went to the passenger side of the vehicle, but the roof was so crushed that Trejo was unable to see Rafael. She returned to look through the driver's side window. Trejo saw Rafael, who could not move but was looking back at her. Trejo later testified that Rafael's eyes were moving at this time. A couple driving by assisted Trejo in removing Rafael from the vehicle. Emergency services arrived shortly thereafter and confirmed that Rafael had died.

*Trejo's suit against Ford*

Trejo subsequently filed a complaint against Ford, alleging a design defect in the roof of the Excursion and seeking damages based on twin theories of strict products liability and common law negligence. The case proceeded to trial solely on the strict products liability theory.

 

During trial, Trejo presented expert testimony to support her theory of "hyperflexion"—that the roof of the Excursion crushed, breaking and pinning Rafael's neck, and causing him to suffocate. Trejo also presented evidence that Ford could have reinforced the roof of the Excursion for an additional $70 in production costs, adding an additional 70 pounds of weight to the Excursion.

Ford presented evidence supporting its theory of "torso augmentation"—that Rafael died during the first rollover, because the moment the Excursion turned upside down, the weight of Rafael's body "diving" into the roof caused his neck to break, killing him instantly. Ford also disputed the feasibility of Trejo's proposed reinforcement to the roof design of the Excursion.

While settling jury instructions, Ford requested the district court to give design defect instructions based on the "risk-utility" test set forth in the Third Restatement.[2] To this end, Ford requested Instruction nos. 21, 22, and 23. The parties also provided the district court with agreed upon alternatives to these instructions, nos. 21A, 22A, and 23A, in the event the court declined to adopt the Third Restatement. Noting that Nevada has not adopted the Third Restatement approach to claims of design defect, the district court declined to give Ford's requested instructions. The district court instead gave the parties their *agreed-upon*

---

[2]The dissent conflates Ford's requested instructions, which change the standard under which a plaintiff must prove a design defect, with instructions that may assist a jury on how to use relevant information. Ford only proffered instructions on the former, and once denied by the district court, agreed to the instructions given and sought no further clarifications to assist the jury with the latter.

alternatives which were stock instructions and reflected the current state of the law.

Ultimately, the jury returned a special verdict in favor of Trejo, answering in the affirmative the following two questions: (1) whether the 2000 Ford Excursion's roof was defective in design, and, if so, (2) whether the 2000 Ford Excursion's roof design defect was a proximate cause of Rafael Trejo's death. The district court entered judgment on the jury's $4.5 million damages award and granted in part and denied in part Ford's subsequent motion to retax costs. Ford filed a motion for judgment as a matter of law or for a new trial, which the district court denied. Ford now appeals.

## DISCUSSION

To determine whether a product is defective in its design under strict tort liability, Nevada has long used the consumer-expectation test. *Ginnis*, 86 Nev. at 413, 470 P.2d at 138. Under the consumer expectation test, a plaintiff must demonstrate that a product "failed to perform in the manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Id.*

In 1998, the drafters of the Third Restatement proposed the risk-utility test for strict product liability design defect claims. Under this test, a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . . and the omission of the alternative design renders the product not reasonably safe." Restatement (Third) of Torts: Prods. Liab. § 2(b) (Am. Law Inst. 1998). Thus, under the risk-

SUPREME COURT
OF
NEVADA

(O) 1947A

6

utility test, in addition to proving elements of negligence, plaintiffs also bear the new burden of proving a "reasonable alternative design." *Id.*

On appeal, Ford urges this court to adopt the risk-utility test for claims of strict product liability design defect and argues that the district court erred in failing to instruct the jury regarding risk-utility analysis. Regardless of the analysis used, Ford argues that Trejo failed to prove that Rafael's death was proximately caused by a defect in the Excursion's roof design. For the reasons stated below, this court declines to adopt the risk-utility test. The risk-utility test, especially its requirement of proof of a reasonable alternative design, would prove fundamentally unfair to Nevada plaintiffs. Instead of being allowed to bolster their case with evidence of an alternative design after the discovery process, a plaintiff would face the barrier of establishing a reasonable alternative design from the outset, even in those cases where no reasonable design may exist, or where the defendant is in complete control of the necessary information related to product design. Because we further conclude that Trejo presented sufficient evidence of design defect under the consumer-expectation test and causation, we affirm the judgment of the district court. *Allstate Ins. Co. v. Miller*, 125 Nev. 300, 308, 212 P.3d 318, 324 (2009) (recognizing that a jury verdict will be upheld if supported by substantial evidence).

*Products liability in Nevada*

In 1966, this court examined a case in which Leo Dolinski purchased a bottle of Squirt soda from a vending machine, took a drink, and discovered the remains of a decomposing mouse. *Shoshone Coca-Cola Bottling Co. v. Dolinski*, 82 Nev. 439, 441, 420 P.2d 855, 857 (1966). Dolinski presented his case to the jury solely on the theory of strict product liability, and the jury awarded Dolinski $2,500 in damages. *Id.*

 

In affirming the jury's verdict, this court determined that when a manufacturer has placed a dangerous or defective product into the stream of commerce, sound public policy requires the imposition of strict liability, even in those situations where "the seller has exercised all reasonable care, and the user has not entered into a contractual relation with him." *Id.* The court noted that

> [b]y placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief. . . . The supplier has invited and solicited the use; and when it leads to disaster, he should not be permitted to avoid the responsibility by saying that he made no contract with the consumer, or that he used all reasonable care.

*Id.* at 442, 420 P.2d at 857 (quoting William L. Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)*, 50 Minn. L. Rev. 791, 799 (1966)).

Nonetheless, this court cautioned that while a manufacturer and distributor of a bottled beverage may be strictly liable without a showing of negligence or privity, the adoption of strict tort liability as a theory of recovery "does not mean that the plaintiff is relieved of the burden of proving a case." *Id.* at 443, 420 P.2d at 857-58. Rather, this court noted that a plaintiff was required to demonstrate that (1) the product at issue was defective, (2) the defect existed at the time the product left the manufacturer, and (3) the defect caused the plaintiff's injury. *Id.* at 443, 420 P.2d at 858.

Four years later in *Ginnis*, this court extended the doctrine of strict tort liability "to the design and manufacture of all types of products." 86 Nev. at 413, 470 P.2d at 138. With respect to proving whether a

 

product is defective, this court also adopted the consumer-expectation test, which is set forth in Section 402A of the Restatement (Second) of Torts (Am. Law Inst. 1965). *Id.* at 414, 470 P.2d at 138. In adopting the consumer-expectation test in *Ginnis*, this court explained that

> [a]lthough the definitions of the term "defect" in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function.

*Id.* at 413, 470 P.2d at 138 (quoting *Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401, 403 (Ill. 1969)). Further, defective products are "more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Id.*

This court has subsequently recognized three categories of strict tort liability claims: manufacturing defects, design defects, and the failure to warn. *See, e.g., Rivera v. Philip Morris, Inc.*, 125 Nev. 185, 190-91, 209 P.3d 271, 274 (2009) (failure to warn); *Krause Inc. v. Little*, 117 Nev. 929, 937-38, 34 P.3d 566, 571-72 (2001) (manufacturing defects); *Robinson v. G.G.C., Inc.*, 107 Nev. 135, 138-39, 808 P.2d 522, 524 (1991) (design defects). In the realm of manufacturing and design defects, this court has consistently applied the consumer-expectation test to determine liability. *See Krause*, 117 Nev. at 937-38, 34 P.3d at 571-72; *Robinson*, 107 Nev. at 138-39, 808 P.2d at 524.

In the context of proving that a product was defective under the consumer-expectation test, this court has concluded that "[a]lternative design is one factor for the jury to consider when evaluating whether a product is unreasonably dangerous." *McCourt v. J.C. Penney Co.*, 103 Nev. 101, 104, 734 P.2d 696, 698 (1987). Therefore, a plaintiff may choose

Supreme Court
of
Nevada

(O) 1947A

9

to support their case with evidence "that a safer alternative design was feasible at the time of manufacture." *Fyssakis v. Knight Equip. Corp.*, 108 Nev. 212, 214, 826 P.2d 570, 572 (1992). However, any alternative design presented must be commercially feasible. *Id.* "[W]hen commercial feasibility is in dispute, the court must permit the plaintiff to impeach the defense expert with evidence of alternative design." *Robinson*, 107 Nev. at 141, 808 P.2d at 525. In addition to evidence of alternative designs, evidence of other accidents involving analogous products, post-manufacture design changes, and post-manufacture industry standards will support a strict product liability claim. *Id.* at 140-43, 808 P.2d at 525-27.

*The Restatement (Third) of Torts risk-utility analysis*

Ford urges this court to depart from this well-settled line of jurisprudence and adopt the risk-utility test for design defects set forth in the Third Restatement. Under the risk-utility test, a product

> is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

Restatement (Third) of Torts: Prods. Liab. § 2(b) (Am. Law Inst. 1998). The drafters of the Third Restatement provide a number of factors relevant to analyzing whether there was a reasonable alternative design and whether the omission of the alternative design renders a product not reasonably safe. Some of the factors for consideration include the magnitude and probability of foreseeable risks of harm; the instructions and warnings included with the product; the nature and strength of

SUPREME COURT OF NEVADA

(O) 1947A

consumer expectations regarding the product, including expectations arising from product advertising and marketing; the advantages and disadvantages of product function arising from the alternative design, as well as the effects of the alternative design on production costs; and the effects of the alternative design on product longevity, maintenance, repair, and esthetics. *Id.* § 2 cmt. f.

Some analysts of the risk-utility approach have posited that the test is better suited to analyzing cases involving complicated or technical design. These proponents of the risk-utility approach also contend that the average consumer does not have ascertainable "expectations" about the performance of a complex product, such as a car, in unfamiliar circumstances. *See* Douglas A. Kysar, *The Expectations of Consumers*, 103 Colum. L. Rev. 1700, 1716 (2003). Accordingly, adopting courts have observed that when faced with a complicated or technical design, the risk-utility analysis "provides objective factors for a trier of fact to analyze when presented with a challenge to a manufacturer's design." *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 15 (S.C. 2010).

Based on these perceived advantages, a number of jurisdictions have exclusively adopted the risk-utility analysis in design defect cases through either caselaw or statute. *See, e.g., Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003); *Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 674 (Ga. 1994); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002); *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004); *Jenkins v. Int'l Paper Co.*, 945 So. 2d 144, 150-51 (La. Ct. App. 2006); *Williams v. Bennett*, 921 So. 2d 1269, 1273 (Miss. 2006); *Rix v. Gen. Motors Corp.*, 723 P.2d 195, 201 (Mont. 1986); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335 (Tex. 1998). Still others have adopted a

 

11

hybrid approach, utilizing the risk-utility approach only in complex design situations. *See, e.g., Soule v. Gen. Motors Corp.*, 882 P.2d 298, 305 (Cal. 1994); *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 347 (Ill. 2008).

*Nevada will continue to follow the consumer-expectation test*

Ford urges this court to join those jurisdictions that have concluded that the risk-utility test better allows a jury to analyze complex cases in which consumer expectations are less clear. Ford also argues that the risk-utility test provides a lay jury with a concrete framework in which to analyze complex or technical products. Despite Ford's arguments, we find that the proposed advantages of the risk-utility test over the consumer-expectations test are largely overstated. Further, as discussed below, the adoption of negligence standards into strict products liability, as well as the affirmative requirement that plaintiffs provide proof of a reasonable alternative design, stands contrary to the public policy supporting Nevada's long-standing use of the consumer-expectation test.

*The consumer-expectation test provides sufficient framework to analyze complex or technical products*

With respect to the clarity of consumer expectations, we conclude that even in cases of complex or technical products, a lay jury is sufficiently equipped to determine whether a product performs in a manner to be reasonably expected under certain circumstances, pursuant to the consumer-expectation test. The Wisconsin Supreme Court noted:

> A determination of "unreasonable danger," like a determination that a product is in a condition not contemplated by the ordinary consumer, does not inevitably require any degree of scientific understanding about the product itself. Rather, it requires understanding of how safely the ordinary consumer would expect the product to serve its intended purpose.

SUPREME COURT
OF
NEVADA

(O) 1947A

*Green v. Smith & Nephew AHP, Inc.*, 629 N.W.2d 727, 742 (Wis. 2001). With respect to the instant case, Ford argues that it is extremely unlikely that the Trejos bought their Excursion with any specific expectation regarding the strength-to-weight ratio of the vehicle roof. Nonetheless, Trejo presented sufficient evidence for the jury to conclude that the level of protection actually provided by the roof in a rollover accident was less than would be expected by a reasonable consumer, indicating that in this case, the distinction between the risk-utility and consumer expectation tests is without practical difference.

Further, to the extent scientific or technical evidence is presented, we note that juries are often requested to digest unfamiliar technical material. The Wisconsin Supreme Court explained that "juries are always called upon to make decisions based upon complex facts in many different kinds of litigation. . . . The problems presented in products liability jury trials would appear no more insurmountable than similar problems in other areas of the law." *Id.* at 743 (quoting *Arbet v. Gussarson*, 225 N.W.2d 431, 438 (Wis. 1975), *overruled in part on other grounds by Greiten v. LaDow*, 235 N.W.2d 677 (Wis. 1975)). Ford presents no evidence that the jury was incapable of digesting the expert testimony and evidence admitted in this case.

The consumer-expectation test also provides a sufficient framework to analyze complex designs. In this, we note that while proof of an alternative design is not required, in most cases, evidence of an alternative design is the most expedient method for a plaintiff to prove that the product at issue was unreasonably dangerous. *See Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 511-12 (Fla. 2015) (citing *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 397 (Pa. 2014)). When evidence of an

 

alternative design is presented, a defendant remains free to argue that a design is not commercially feasible. Therefore, evidence related to the majority of factors in the risk-utility test remains admissible, including evidence related to the advantages and disadvantages of product function arising from the alternative design; the effect of the alternative design on production costs; and the effect of the alternative design on product longevity, maintenance, repair, and esthetics.[3] *See* Restatement (Third) of Torts: Prods. Liab. § 2 cmt. f (Am. Law Inst. 1998). Similarly, evidence related to other factors identified by the drafters of the Third Restatement, including evidence related to instructions and warnings included with the product, as well as product advertising and marketing, remains relevant to prove a reasonable consumer's expectations with respect to the product.

*The risk-utility approach presents tangible disadvantages*

In addition to our determination that the proposed benefits of the risk-utility test are overstated, the risk-utility approach also presents several tangible disadvantages. When we first adopted the theory of strict liability in *Shoshone*, this court reasoned that when a seller has advertised

---

[3]Contrary to the suggestion of our dissenting colleague, our holding does nothing "to place limits on the use of risk-utility evidence in products liability cases." Our holding in no way limits the presentation of relevant evidence, including evidence regarding a reasonable alternative design. Indeed, we note that Trejo chose to present evidence of an alternative design, arguing that Ford could have reinforced the roof of the Excursion for an additional $70 in production costs, adding an additional 70 pounds of weight to the vehicle. Ford presented evidence demonstrating that this design was not commercially feasible. Both parties argued these respective positions to the jury. Thus, the only practical effect of Ford's request would have been to instruct the jury regarding the shifted burden of proof for reasonable alternative design.

Supreme Court
OF
Nevada

(O) 1947A

14

a product, and invited and solicited its use, the seller should not be permitted to avoid the consequences of a "disaster" by arguing that he used all reasonable care. 82 Nev. at 442, 420 P.2d at 857. Accordingly, the consumer-expectation test focuses on the reasonable expectations of a consumer regarding the use and performance of a product. Rather than focus on the product itself, the risk-utility test subverts this analysis, focusing on the "foreseeable risks of harm" apparent to a manufacturer when adopting a design. This inserts a negligence standard into an area of law where this court has intentionally departed from traditional negligence analysis. *See Aubin*, 177 So. 3d at 506; *Green*, 629 N.W.2d at 751 (noting that the risk-utility test unnecessarily "blurs the distinction between strict products liability claims and negligence claims"). By focusing on the conduct of the manufacturer in designing and developing, rather than the product itself, the risk-utility test is in direct conflict with the reasoning of this court in *Shoshone* and its progeny.

Further, as noted by the Kansas Supreme Court, the risk-utility test

> is impoverished especially insofar as the [drafters of the Third Restatement] ruled out consumer expectations as an independent test. They thereby ignored the centrality of what we all know as people . . . : the centrality of product portrayals and images and their role in creating consumer motives to purchase or encounter products.

*Delaney v. Deere & Co.*, 999 P.2d 930, 945 (Kan. 2000) (quoting Marshall S. Shapo, *Defective Restatement Design*, 8 Kan. J.L. & Pub. Pol'y 59, 60 (1998)). Given the unique position of manufacturers, we agree that by advocating for the negligence-based risk-utility approach, "the Third Restatement fails to consider the crucial link between a manufacturer

 

establishing the reasonable expectations of a product that in turn cause consumers to demand that product." *Aubin*, 177 So. 3d at 507.

In addition to this departure from the policy supporting consumer-expectations analysis, we note that by requiring plaintiffs to demonstrate proof of a reasonable alternative design, the risk-utility approach actually imposes a higher bar for recovery than that in a case involving standard negligence claims—"the antithesis of adopting strict products liability in the first place." *Id.* at 506. In addition to the inherent inequity in imposing an additional element of proof beyond negligence, this requirement presents several practical dilemmas.

First, the requirement that plaintiffs present evidence of a reasonable alternative design presents a prohibitive barrier to entry for many plaintiffs. As noted by the Connecticut Supreme Court, this "would require plaintiffs to retain an expert witness even in cases in which lay jurors can infer a design defect from circumstantial evidence." *Potter v. Chi. Pneumatic Tool Co.*, 694 A.2d 1319, 1332 (Conn. 1997). The court in *Aubin* similarly observed "that the reasonable alternative design requirement is not supported by public policy or economic analysis because the cost of processing a case will make it economically impossible to produce a reasonable alternative design in a small products liability case." 177 So. 3d at 508. Further, while evidence of an alternative design is often the most expedient way for a plaintiff to demonstrate that the product at issue was not reasonably safe, affirmatively requiring such evidence actively shifts the focus of a case away from the defective product that is the subject of the litigation. *See Delaney*, 999 P.2d at 946.

As a second practical concern, multiple courts have observed that "in some instances, a product may be in a defective condition

unreasonably dangerous to the user even though no feasible alternative design is available." *Potter*, 694 A.2d at 1332; *see also Aubin*, 177 So. 3d at 507. While the comments to the Third Restatement appear to contemplate an exception to the alternative design requirements for those products, a plaintiff in these cases is required to demonstrate a "manifestly unreasonable design." Restatement (Third) of Torts: Prods. Liab. § 2 cmt. e (Am. Law Inst. 1998). As observed by the *Aubin* court, this heightened standard "imposes an undue burden on plaintiffs that might preclude otherwise valid claims from jury consideration." 177 So. 3d at 507 (quoting *Potter*, 694 A.2d at 1332).

*Public policy favors retention of the consumer-expectation test*

This court is not persuaded that the Third Restatement's risk-utility analysis provides a superior framework for analyzing claims of design defect. Rather, the risk-utility analysis inserts negligence standards into claims of design defect, contrary to the public policy supporting the adoption of strict liability in Nevada. The requirement that plaintiffs must provide proof of a reasonable alternative design is not supported by Nevada law and poses an unfair burden to many prospective plaintiffs. Therefore, claims of design defect in Nevada will continue to be governed by the consumer-expectation test. Accordingly, we conclude that the district court did not err in declining to give Ford's proposed jury instruction on the risk-utility test. *See Atkinson v. MGM Grand Hotel, Inc.*, 120 Nev. 639, 642, 98 P.3d 678, 680 (2004) (noting that the "decision to give or decline a proposed jury instruction is reviewed for an abuse of discretion or judicial error").

*The verdict is supported by sufficient evidence*

Ford also contends that the testimony of Trejo's biomechanical expert lacked factual foundation and that the district court wrongfully

allowed the coroner who performed the autopsy on Rafael to testify as a nonretained expert. Therefore, viewed as a whole, Ford argues that the jury's verdict is not supported by sufficient evidence, indicating that the district court abused its discretion in denying Ford's motion for a new trial or motion for judgment as a matter of law. We disagree.

While there was some potential conflict between the testimony of Trejo's biomechanical expert and mechanical engineering expert regarding when the roof was crushed during the rollover sequence, "[i]t is a well settled rule in this state that whenever conflicting testimony is presented, it is for the jury to determine what weight and credibility to give to that testimony." *Allen v. State*, 99 Nev. 485, 487, 665 P.2d 238, 240 (1983); *see also Houston Expl. Inc. v. Meredith*, 102 Nev. 510, 513, 728 P.2d 437, 439 (1986) (noting that the jury, not the court, must determine the weight given to conflicting expert testimony). Accordingly, the district court did not abuse its discretion in admitting this testimony. *Rish v. Simao*, 132 Nev., Adv. Op. 17, 368 P.3d 1203, 1208 (2016).

We further conclude that coroner Ross Zumwalt did not rely on any sources outside of his statutorily mandated examination of Rafael Trejo in forming his opinions and appropriately testified as a nonretained expert. *See* NRS 259.050(1) (requiring a coroner to perform an investigation when a "death has been occasioned by unnatural means"); *FCH1, LLC v. Rodriguez*, 130 Nev., Adv. Op. 46, 335 P.3d 183, 189 (2014).

Given our conclusion that biomechanical engineer Joseph Peles' and Zumwalt's testimony was appropriately admitted, we conclude, "after viewing all inferences in favor of the prevailing party, substantial evidence supports the jury's verdict." *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 273, 71 P.3d 1264, 1267 (2003). Trejo presented multiple

 

witnesses to support her theory that the roof of the Excursion crushed, pinning Rafael in a hyperflexion position, causing him to suffocate, including testimony by mechanical engineer Brian Herbst, Peles, Zumwalt, and her own testimony. While Ford presented evidence to dispute this testimony, well-settled law dictates that it is the role of the jury, not this court, to weigh conflicting evidence. *Id.* Therefore, we will not disturb the district court's denial of Ford's motion for judgment as a matter of law or motion for a new trial. *See Nelson v. Heer*, 123 Nev. 217, 222-23, 163 P.3d 420, 424 (2007) (noting that we will uphold denial of a motion for judgment as a matter of law if sufficient evidence exists to support a verdict for the nonmoving party, and will not disturb the denial of a motion for a new trial "absent palpable abuse" of discretion (internal quotation omitted)).

## CONCLUSION

The risk-utility test for strict product liability design defect claims represents a significant departure from current Nevada law. Notably, the risk-utility test inserts a negligence analysis into traditional claims of strict product liability and imposes an unfair additional requirement on plaintiffs to present evidence of a reasonable alternative design. Accordingly, this court declines to adopt the risk-utility test. Claims of design defect in Nevada will continue to be governed by the consumer-expectation test, which we believe best supports the policy reasons allowing recovery under the theory of strict products liability.

The jury in this case was properly instructed on the consumer-expectation test. Further, the record demonstrates that Trejo presented sufficient evidence to demonstrate that the roof of the Ford Excursion failed to perform in a manner reasonably expected in light of its nature and intended function and was more dangerous than would be

contemplated by the ordinary user having the ordinary knowledge available in the community. Trejo also presented evidence sufficient to demonstrate that Rafael Trejo's death was caused by this defect. Therefore, we affirm the judgment on the jury verdict, as well as the post-judgment order awarding costs.

_____, J.
Stiglich

We concur:

_____, C.J.
Cherry

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Hardesty

SUPREME COURT
OF
NEVADA

(O) 1947A

PICKERING, J., dissenting:

The jury instructions the district court gave and the majority affirms were inadequate. They told the jury to decide this case based solely on "consumer expectations," that is, on how the jurors thought an "ordinary user having the ordinary knowledge available in the community" would have expected the Excursion's roof to function in a highway-speed rollover. The district court refused Ford's request that the court also instruct the jury on whether, based on the expert testimony they heard, a feasible alternative design existed for the roof that would have protected Trejo, who was in the front passenger seat, from being crushed in the rollover.

Neither Nevada law, nor the law nationally, supports deciding a design defect case such as this based solely on consumer expectations. The failure to instruct the jury on alternative design left the jurors with no specific guidance on the law by which to decide the case. While I would not pursue an alternative design or "risk-utility" analysis to the exclusion of consumer expectations—a position the majority erroneously attributes to the Restatement (Third) of Torts: Products Liability (Am. Law Inst. 1998)—the jury can and should be instructed on alternative design in addition to consumer expectations where, as here, evidence has been presented to support it. As this instructional error clouds the verdict's reliability, I would reverse and remand for a new trial. I therefore dissent.

I.

Nevada imposes strict liability on manufacturers and distributors who place in the hands of users a product that is "unreasonably dangerous." *Ward v. Ford Motor Co.*, 99 Nev. 47, 49, 657 P.2d 95, 96 (1983). As the majority notes, there are three principal types

of products liability claims: manufacturing defect; design defect; and inadequate warnings. In *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 413, 470 P.2d 135, 138 (1970), we endorsed what has come to be known as the consumer expectation test as an appropriate means of assessing "unreasonable dangerousness." Under this test, the plaintiff must demonstrate that the product "fail[ed] to perform in the manner reasonably to be expected in light of [its] nature and intended function" and "was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community." *Id.* (quoting *Dunham v. Vaughan & Bushnell Mfg. Co.*, 247 N.E.2d 401, 403 (Ill. 1969)). The *Ginnis* formulation has been applied to all three types of product liability claims. *See Lewis v. Sea Ray Boats, Inc.*, 119 Nev. 100, 105, 65 P.3d 245, 248 (2003) (inadequate warnings); *Ward*, 99 Nev. at 48, 657 P.2d at 96 (design and manufacturing defects).

As part of, or in addition to, the consumer expectation test, Nevada has endorsed using the existence of a safer alternative design to prove that a design defect or lack of warnings made a product unreasonably dangerous. *McCourt v. J.C. Penney Co.*, 103 Nev. 101, 102, 104, 734 P.2d 696, 697, 698 (1987) (citing *Ginnis* and reversing because the district court erred in refusing, in a design defect case, to admit evidence of feasible alternative design: "Alternative design is one factor for the jury to consider when evaluating whether a product is unreasonably dangerous"); *see also Fyssakis v. Knight Equip. Corp.*, 108 Nev. 212, 214, 826 P.2d 570, 572 (1992) ("Under Nevada law, evidence . . . that a safer alternative design was feasible at the time of manufacture will support a strict liabilities claim."); *Robinson v. G.G.C.*, 107 Nev. 135, 138, 808 P.2d 522, 525 (1991) ("a manufacturer may be liable for the failure to provide a

safety device if the inclusion of the device is commercially feasible, will not affect product efficiency, and is within the state of the art at the time the product was placed in the stream of commerce"); *Michaels v. Pentair Water Pool & Spa, Inc.*, 131 Nev., Adv. Op. 81, 357 P.3d 387, 397 (Ct. App. 2015) (under Nevada law a design defect "may be determined with reference to such things as whether a safer design was possible or feasible, whether safer alternatives are commercially available, and other factors") (citing *McCourt*, 103 Nev. at 104, 734 P.2d at 698). Though not denominated as such by our case law, this balancing of a possible safer alternative design against its commercial feasibility is known as the "risk-utility" approach to determining product defect. *See* 1 David G. Owen & Mary J. Davis, *Owen & Davis on Products Liability* § 8:7 (4th ed. 2014). A risk-utility analysis determines "[w]hether a particular design danger is 'unreasonable' (that is, 'defective')" by balancing "'the probability and seriousness of harm against the costs of taking precautions. Relevant factors to be considered include the availability of alternative designs, the cost and feasibility of adopting alternative designs, and the frequency or infrequency of injury resulting from the design.'" *Id.* (quoting *Raney v. Honeywell, Inc.*, 540 F.2d 932, 935 (8th Cir. 1976)).

At trial, both sides presented evidence regarding alternative roof designs and their commercial feasibility, as *McCourt* and its progeny allow. Trejo affirmatively alleged that a safer alternative design was available and presented expert testimony that the design was commercially reasonable. Ford presented contradictory evidence, to the effect that Trejo's expert's proposed design was not, in fact, safer and, further, created issues of commercial unreasonableness.

Based on this admitted evidence, Ford sought to have the jury instructed on alternative design by adding the italicized language to the stock product-defect jury instruction:

[Proposed] Instruction No. 21

In order to establish a claim of strict liability for a defendant product, the plaintiff must prove the following elements by a preponderance of the evidence:

1. That Ford Motor Company was the manufacturer of the 2000 Ford Excursion;

2. That the 2000 Ford Excursion's roof structure was defectively designed;

3. That the defect existed when the 2000 Ford Excursion left Ford Motor Company's possession;

4. That the 2000 Ford Excursion was used in a manner which was reasonably foreseeable by Ford Motor Company;

5. *There existed a reasonable alternative design*; and

6. That the defect was a proximate cause of the injury to Rafael Trejo.

(emphasis added to show proposed addition to *Nevada Jury Instructions— Civil* § 7PL.4 (2011)). Ford also offered [Proposed] Instruction No. 22, as follows:

A product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design and the omission of the alternative design renders the product not reasonably safe.

Although these requested instructions accurately stated Nevada law under *McCourt*, the district court rejected them. It also rejected every other jury instruction Ford proposed that touched on

reasonable alternate design.[1] As a result, the jury received no instructions on how to apply the evidence regarding a safer alternative design and its commercial feasibility to determine whether the Excursion was unreasonably dangerous due to a design defect.

The court gave only stock product liability instructions to the jury. Thus, the district court gave as Instruction No. 19 what Ford had tendered as [Proposed] Instruction No. 21, *minus* the italicized language about reasonable alternative design, *reprinted supra* at 3-4. It also gave, as the only other guidance on how the jury should decide design defect, the following stock instructions:

> Instruction No. 20
>
> A product is defective in its design if, as a result of its design, the product is unreasonably dangerous.
>
> Instruction No. 21
>
> A product is unreasonably dangerous if it failed to perform in the manner reasonably to be

---

[1]In addition to the instructions reprinted in the text, Ford proposed a "state of the art defense" instruction and, citing *Robinson v. G.G.C.*, 107 Nev. at 139-40, 808 P.2d at 526, an instruction that would have told the jury as a minimal alternative that "[a] manufacturer is not required to produce the safest design possible." Both were refused, as was Ford's additional proposed instruction based on the Restatement (Third) section 2(b) that would have told the jury that, in assessing risk-utility, to consider "(a) the likelihood that the product will cause injury considering the product as sold with any instructions or warnings regarding its use; (b) the ability of the plaintiff to have avoided injury; (c) the plaintiff's awareness of the product's dangers; (d) the usefulness of the product as designed as compared to a safe design; (e) the functional and monetary cost of using the alternative design; and (f) the likely effect of liability for failure to adopt the alternative design on the range of consumer choice among products."



expected in light of its nature and intended function, and was more dangerous than would be contemplated by the ordinary user having the ordinary knowledge available in the community.

*See Nevada Jury Instructions—Civil* § 7PL.7 (2011). While these instructions are accurate, they are incomplete and misleading as a result. "[C]onsumers comprehend that automobiles are not completely crashproof, but they have no meaningful expectations as to the extent to which a vehicle may be compromised in the event of a collision or rollover at substantial speeds." 1 Owen & Davis, *supra*, at § 8:5. The jury should have been instructed on all of the law pertinent to the evidence presented, including alternative design.

The instructions the jury received failed to give them any guidance on how to utilize the ample expert evidence presented over the course of the two-week trial regarding Trejo's proffered alternative design and Ford's arguments that the alternative design was proven neither to be safer nor commercially feasible. *See Woosley v. State Farm Ins. Co.*, 117 Nev. 182, 188, 18 P.3d 317, 321 (2001) (providing that it is error for the court to refuse to give a jury "instruction when the law applies to the facts of the case"). Indeed, with the instructions given to the jury, such evidence would not even factor into their decision as to whether the Excursion was unreasonably dangerous as designed.

The refusal to give an instruction regarding the evidence presented contravenes this court's long-held tenet that "a party is entitled to have the jury instructed on all of [its] case theories that are supported by the evidence." *Atkinson v. MGM Grand Hotel, Inc.*, 120 Nev. 639, 642, 98 P.3d 678, 680 (2004) (quoting *Silver State Disposal Co. v. Shelley*, 105 Nev. 309, 311, 774 P.2d 1044, 1045 (1989)). While the majority recognizes that Nevada's jurisprudence allows for the presentation of risk-utility

Supreme Court
of
Nevada

(O) 1947A

evidence in products liability cases (albeit as part of the consumer-expectation test), it disconcertingly concludes that there was no error in the district court's failure to instruct the jury regarding alternative design or risk-utility in this case.[2] With this holding, it is unclear whether the majority intends to place limits on the use of risk-utility evidence in products liability cases[3] or intends to relax the requirement that district courts must instruct juries based on the evidence presented at trial, but what is clear is that this holding diverges from current Nevada law. The failure to give the jury instructions that are supported by both this court's

[2]The majority characterizes Ford's proposed jury instructions as asking the district court to overrule or change existing Nevada law, something a district court cannot do. But this misreads the record and the law. Nevada has never rejected feasible alternative design as an appropriate consideration in a design defect case. *See McCourt*, 103 Nev. at 102, 734 P.2d 696 at 697-98 and Nevada cases cited, *supra*, at 1-2. And, even in its proposed risk-utility instructions, Ford included consumer expectations as a factor to be considered.

Also unavailing is the majority's suggestion that Ford somehow waived its right to have the jury instructed on alternative feasible design. It requested the instructions; it objected to the failure to give them; and it moved for a new trial based on instructional error. The law does not require more. *See Johnson v. Egtedar*, 112 Nev. 428, 434-35, 915 P.2d 271, 275 (1996) (recognizing that if a court is "adequately apprised of the issue of law involved and was given an opportunity to correct the error," then a party has adequately reserved a jury instruction issue for appellate review).

[3]If this is the majority's intent, such a holding would place Nevada in the extreme minority of jurisdictions that do not allow any evidence of risk-utility in design defect cases as is discussed more in depth in the next section. *See* Aaron D. Twerski & James A. Henderson, Jr., *Manufacturers' Liability for Defective Product Designs: The Triumph of Risk-Utility*, 74 Brook. L. Rev. 1061, 1104-05 (2009).

prior jurisprudence and the evidence and pleadings presented by the parties constitutes reversible error because, had the jury been instructed on the risk-utility test, the outcome of the case may have been different. *Id.*; *see also Cook v. Sunrise Hosp. & Med. Ctr., LLC*, 124 Nev. 997, 1005-06, 194 P.3d 1214, 1219 (2008) (holding that an error in jury instructions warrants reversal when a different result might have been reached had the court given the proper instructions).

This court encountered a similar jury instruction issue in *Lewis v. Sea Ray Boats, Inc.*, 119 Nev. 100, 65 P.3d 245 (2003). In that case involving an allegation of an inadequate warning on a boat's generator, a party requested an instruction that would define "adequate warning" for the jury. *Id.* at 104-05, 65 P.3d at 248. The court refused to give the instruction and instead gave more generalized instructions.[4] *Id.* at 105, 65 P.3d at 248. On appeal, this court held that the general instructions were insufficient to guide the jury both because jurors had "to search their imaginations to test the adequacy of the warnings" and because, due to the expert witness testimony given, the jurors were "entitled to more specific guidance" on the law governing the case. *Id.* at 108, 65 P.3d at 250.

The same reasoning should be applied here: the more specific instructions provided greater guidance to the jury and the district court's

---

[4]The proposed instruction provided that a warning must be designed to catch the attention of the consumer, give a fair indication of the specific risks attributable to the product, and that the intensity of the warning match the danger being warned against. *Lewis*, 119 Nev. at 105, 65 P.3d at 248. In comparison, the given instruction merely provided that whether a warning was legally sufficient depended upon the language used and its impression on the consumer. *Id.*

failure to give those more specific instructions warrants a reversal of the jury verdict and a remand for a new trial. *See id.* (reversing and remanding for a new trial based on the failure to give more specific instructions to the jury). A district court cannot abdicate its duty to instruct the jury on the relevant law as it is informed by the evidence presented at trial. *See Am. Cas. Co. v. Propane Sales & Serv., Inc.*, 89 Nev. 398, 400-01, 513 P.2d 1226, 1228 (1973) (reversing and remanding where the instructions given to the jury were so general that it gave "the jury a roving commission as to the facts and permit[ted] them to pass upon a question of law according to any theory they could construct or evolve in their own minds" and because it abdicated the court's duty to explain the law of the case "and to bring into view the relations of the particular evidence adduced to the particular issues involved" (internal quotation marks omitted)); *Beck v. Haley*, 239 A.2d 699, 702 (Del. 1968) (relied upon in *American Casualty* and holding that jury instructions should be based on the evidence presented at trial).

Based on the foregoing, I would reverse and remand this matter for a new trial.

## II.

The majority's approval of jury instructions that focus on consumer expectations to the exclusion of risk-utility considerations not only contravenes preexisting Nevada law, it also makes Nevada an outlier, as only a small minority of jurisdictions rely solely on consumer expectations in design defect cases. *See* Twerski & Henderson, *Manufacturers' Liability for Defective Product Designs*, 74 Brook. L. Rev. at 1104-05 (stating that only Kansas, Nebraska, Oklahoma, Wisconsin, and possibly Maryland solely apply a consumer-expectation test to design

 

defect claims); *but see* Wis. Stat. Ann. § 895.047(1)(a) (West 2015) (by statute adopted in 2011, Wisconsin follows a risk-utility approach in design defect cases). En route to this holding, the majority also mischaracterizes the risk-utility test as presented by the Restatement (Third) and how it is applied.

### A.

Like Nevada (at least until today), most jurisdictions recognize that both consumer expectations and feasible alternative design or risk-utility evidence have legitimate roles to play in design defect cases. Feasible alternative design evidence plays a predominant role in design defect, as opposed to manufacturing defect, cases because of the difference in the two types of claims: "Whereas a manufacturing defect consists of a product unit's failure to meet the manufacturer's design specifications, a product asserted to have a defective design meets the manufacturer's design specifications but raises the question whether the specifications themselves create unreasonable risk." Restatement (Third) of Torts: Products Liability § 2 cmt. d.

Analyzing the manufacturer's design choice cannot be done in a void, leading courts to strike a balance between the consumer-expectation test and risk-utility test. California has created a test wherein consumer expectations are reserved for those cases where "*everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design.*" *Soule v. Gen. Motors Corp.*, 882 P.2d 298, 308 (Cal. 1994); *see also* Twerski & Henderson, *Manufacturers' Liability for Defective Product Designs*, 74 Brook. L. Rev. at 1098-1101 (listing ten other jurisdictions that use the

 

same approach as California). Thus, the jury is exclusively instructed on risk-utility only when the evidence presented would not support a jury verdict based on consumer expectations. *Soule*, 882 P.2d at 309. Illinois' approach is to include consumer expectations as a factor to consider under the risk-utility test when the evidence presented at trial implicates both tests, with the alternative design criteria controlling in design defect cases. *See Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 350-52 (Ill. 2008).

Even those jurisdictions that appear to exclusively adopt a risk-utility test for design defect cases nevertheless recognize consumer expectations as a factor for consideration. *Compare Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (holding that a safer alternative design is required in design defect cases raised under Alabama's Extended Manufacturer's Liability Doctrine and cited by the majority for the proposition that Alabama exclusively uses the risk-utility test), *with Horn v. Fadal Machining Ctrs., LLC*, 972 So. 2d 63, 70 (Ala. 2007) (providing that a claim under the same doctrine can be won by showing the product failed to meet consumer expectations). *See also Banks v. ICI Americas, Inc.*, 450 S.E.2d 671, 675 n.6 (Ga. 1994) (listing factors relevant to a risk-utility analysis, which include "the user's knowledge of the product . . . as well as common knowledge and the expectation of danger"); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 170 (Iowa 2002) ("Although consumer expectations are not the sole focus in evaluating the defectiveness of a product under the [Third] Products Restatement, consumer expectations remain relevant in design defect cases."); *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 432-33 (Ky. 1980) (holding that consumer expectations is a factor to be considered in a design defect case, along with other risk-

utility factors); *Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) (quoting *Clark v. Brass Eagle, Inc.*, 866 So. 2d 456, 460 (Miss. 2004), with approval and *Clark* notes that Mississippi's products liability law is a hybrid of the consumer-expectation test and the risk-utility test); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 335-37 (Tex. 1998) (refusing to adopt a new rule of law regarding design defect and recognizing that the risk-utility test includes consideration of the consumer's expectations of the product). The Restatement (Third) also provides a comprehensive analysis of this issue, concluding that the risk-utility analysis should predominate in design defect cases but still include consideration of consumers' expectations. Restatement (Third) of Torts: Products Liability § 2 & cmt. f.

The varied foregoing approaches to incorporating both the consumer-expectations test and the risk-utility test into design defect cases demonstrate the difficulty presented by this issue. The fact that the task is difficult or that there may be more than one possible solution, however, does not justify the majority's decision to exclude all references to risk-utility evidence in the instructions given to the jury.

### B.

The majority gives a series of reasons for rejecting the risk-utility approach offered by the Restatement (Third). On the surface, the concerns seem legitimate but, at their core, they rest on a fundamental misunderstanding of what the Restatement (Third) actually proposes in design defect cases.

First, the majority asserts that by requiring evidence of a feasible alternative design prior to the discovery process, the risk-utility test places a "prohibitive barrier" to a plaintiff bringing a case, especially

since the defendant controls the information related to product design. *See* majority opinion, *ante*, at 16. But the Restatement's feasible alternative design provision relates to proof *at trial*, after discovery, and specifically "assume[s] that the plaintiff will have the opportunity to conduct reasonable discovery so as to ascertain whether an alternative design is practical." Restatement (Third) of Torts: Products Liability § 2 cmt. f. Thus, the feasible alternative design requirement is not a mandatory prerequisite to filing a design defect claim under the Restatement (Third).

Second, the majority criticizes the Restatement (Third) as failing to recognize that proof of a feasible alternative design should not be required in every design defect case, especially those where no feasible alternative design exists. *See* majority opinion, *ante* at 16. But again, the Restatement (Third) does not propose the rule the majority criticizes. On the contrary, the Restatement makes specific provision for design defect claims that do not require feasible alternative design evidence. For example, if the product is manifestly unreasonable, or it has little social use and a high degree of danger, a court may declare it to be defective in design without evidence of a feasible alternative design. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. e (using the example of a child's pellet gun that uses pellets hard enough to cause injury).

Going beyond the comments to section 2, section 3 of the Restatement (Third) provides for imposition of strict liability without regard to alternative design in cases involving inexplicable product malfunction. Restatement (Third) of Torts: Products Liability § 3 ("It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of

 

a specific defect, when the incident that harmed the plaintiff: (a) was of a kind that ordinarily occurs as a result of product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution."); id. at cmt. b (acknowledging that product malfunction can implicate design as well as manufacturing defects). This section comports with Nevada product liability law. Indeed, the Reporter's Note to section 3, cmt. b, of the Restatement (Third) quotes with approval this court's holding in *Stackiewicz v. Nissan Motor Corp. in U.S.A.*, 100 Nev. 443, 448, 686 P.2d 925, 928 (1984), "that proof of an unexpected, dangerous malfunction may suffice to establish a prima facie case for the plaintiff of the existence of a product defect." And in section 4, the Restatement (Third) provides for design and other product defect claims premised on a manufacturer's failure to meet applicable safety statutes or administrative regulations without proof of a feasible alternative design. *See* Restatement (Third) of Torts: Products Liability § 4; *see also id.* at § 2 Reporters' Note cmt. b (stating that § 4 of the Restatement provides an alternative ground for proving design defect that does not require proof of a feasible alternative design).

In sum, the majority's suggestion that the Restatement (Third) requires proof of alternative design in all design defect cases is simply incorrect. There are numerous instances wherein a plaintiff could succeed on a design defect claim without providing evidence of a feasible alternative design.

C.

Also problematic is the majority's failure to acknowledge the shortcomings of the consumer expectation test, especially in design defect cases. First, and most important, the consumer expectation test does not

fairly allow design defect claims when the design dangers are obvious. "Because consumers acquire their safety and danger expectations most directly from a product's appearance, obvious dangers—such as the risk to human limbs from an unguarded power mower or industrial machine—are virtually always contemplated or expected by the user or consumer, who thereby is necessarily unprotected by the consumer expectations test, no matter how probable and severe the likely danger nor how easy and cheap the means of avoiding it." 1 Owen & Davis, *supra*, at § 8:5.

"Another significant limitation on the usefulness of consumer expectations as a liability standard in design cases concerns the vagueness of a consumer's expectations concerning most complex designs." *Id.* As the disconnect between the jury instructions and the expert evidence presented over the course of the ten-day trial in this case illustrates, assessing design defect requires more of a measure than simply consumer expectations. Instructing the jury to consider alternative design, in addition to consumer expectations, allows the jury to determine not just malfunction but design defect.

### III.

The error in the instructions requires reversal and remand for a new trial. By affirming the instructions the jury was given, the majority has moved Nevada from the mainstream—where courts and commentators alike are striving to strike the proper balance between risk-utility and consumer-expectations analyses in design defect cases—to a minority of three or four jurisdictions that rely solely on consumer expectations. While I do not necessarily advocate for the Restatement (Third) over the approaches variously taken by California or Illinois, Nevada should at a minimum adhere to its prior case law recognizing that feasible alternative design has a legitimate and important role to play in

 

design defect cases. As the complete elimination of feasible alternative design from the design-defect calculus is unsound, I respectfully dissent.

_Pickering_ , J.

Pickering

SUPREME COURT
OF
NEVADA

(O) 1947A